UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

JODY GORRAN,                          :

               Plaintiff,        :

      - against -                 :

ATKINS NUTRITIONALS, INC., and        :
PAUL D. WOLFF, Solely in his
Representative Capacity as             :
Co-Executor of the Estate of
Robert C. Atkins, M.D.,               :

            Defendants.        :

- - - - - - - - - - - - - - - - - -x

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:                      │
│ DATE FILED: 12/11/06        │
└─────────────────────────────┘
```

**OPINION**

05 Civ. 10679 (DC)

**APPEARANCES:**   DANIEL KINBURN, ESQ.
Attorney for Plaintiff
Physicians Committee for Responsible Medicine
5100 Wisconsin Avenue, N.W.
Washington, D.C.   20116

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
Attorneys for Defendant Atkins Nutritionals, Inc.
    By:   Thomas Leghorn, Esq.
         Bruce Ainbinder, Esq.
         Laura Kramer, Esq.
150 East 42nd Street
New York, New York   10017

GREENBERG TRAURIG, LLP
Attorneys for Defendant Paul D. Wolff,
Co-Executor of the Estate of
Robert C. Atkins, M.D.
    By:   Alan Mansfield, Esq.
         William A. Wargo, Esq.
MetLife Building
200 Park Avenue
New York, New York   10166

**CHIN, D.J.**

       Plaintiff Jody Gorran, a 53-year old businessman, went
on the popular low-carbohydrate Atkins Diet (the "Diet") in the
spring of 2001.  Six months earlier, his cholesterol level was
only 146 and he had a "very low risk" of heart disease.  After

just two months on the Diet, however, his cholesterol level shot up to 230.  Nonetheless, he remained on the Diet until October 2003, when he experienced severe chest pain.  As a consequence, he had an angioplasty -- a surgical procedure -- to unclog one of his coronary arteries, and a stent was placed into the artery to help keep it open.

Gorran now sues defendants Atkins Nutritionals, Inc. ("ANI"), and Paul D. Wolf, co-executor of the Estate of Robert C. Atkins, M.D. (the "Estate"), for products liability, negligent misrepresentation, and deceptive conduct under Florida law. Gorran contends that the Diet is dangerous because it calls for a high-fat, high-protein, low-carbohydrate diet that increases the risk of coronary heart disease, diabetes, stroke, and certain types of cancer.  He alleges that products sold by defendants -- books, food products, and nutritional supplements -- are "defective and unreasonably dangerous."  He seeks money damages as well as an injunction requiring defendants to put warning labels on all Atkins products and the ANI website.

Defendants move pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings dismissing the complaint.  The motions are granted, for Gorran's claims are meritless.  Defendants' books and food products are not defective or dangerous products within the meaning of products liability law.  Pastrami and cheesecake -- large amounts of which Gorran admittedly consumed -- may present risks, but these are risks of which consumers are aware.  The average consumer surely

anticipates that these and other high-fat or high-protein foods may increase cholesterol levels and the risk of heart disease. Moreover, the Diet consists of advice and ideas. The concepts may be controversial and the subject of criticism, but they are protected by the First Amendment. For these and other reasons set out below, Gorran's claims are dismissed.

**BACKGROUND**

**A.    The Facts**

The facts are drawn from the complaint, the 1999 and 2002 editions of the book Dr. Atkins' New Diet Revolution, authored by Robert C. Atkins, M.D. (the "Book"), and the ANI website, www.atkins.com (the "Website").[1]  For purposes of these motions, the facts alleged by Gorran are assumed to be true.

**1.    The Atkins Diet**

The late Dr. Robert Atkins conceived the Diet in the 1970s. (Compl. ¶ 6). The Diet advocates a high-protein, low-carbohydrate diet, promising potential dieters that they "can eat all [they] want, lose weight and stay healthy, so long as [they] restrict carbohydrates." (Id. ¶ 10).

---

[1]    Gorran purchased both the 1999 and 2002 editions of the Book. (Compl. ¶ 84). Various pages of the Book are attached as exhibits to the complaint, and the complaint relies heavily upon and quotes extensively from the Book. Therefore, in ruling on these motions, I consider both editions of the Book, see Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002), which are attached as Exhibits A and B to the Declaration of William A. Wargo, dated April 3, 2006 ("Wargo Decl."). In addition, the complaint extensively quotes the Website and incorporates it by reference. Pages from the Website are attached as exhibits to the complaint as well.

The Diet is described as one that:

• Completely excludes hunger from the dieting experience;

• Includes food so rich that you've never seen them on any other diet;

• Produces steady weight loss even if you have experienced dramatic failure or weight regain on other diets; and

• Is so perfectly adapted to use as a lifetime diet that, unlike most diets, the lost weight won't come back.

(Id. ¶ 11 (quoting Robert C. Atkins, M.D., Dr. Atkins' New Diet Revolution 4 (M. Evans & Co., Inc. 1999) (the "1999 Edition") (Compl. Ex. C))).[2]

The Diet teaches that "Fat satiates the appetite . . . . Fat stops carbohydrate craving.  And fat, in the absence of carbohydrates, accelerates the burning of stored fat.  The wise dieter can use fat to his advantage."  (Id. ¶ 25 (quoting 1999 Edition at 22 (Compl. Ex. D))).  The Diet insists that it is safe for everyone, regardless of the amount of high-fat food the dieter consumes.  (Id. ¶ 26).

Because there has been no long-term study of the Diet, there is no scientific evidence of the impact of following the Diet on the long-term health of dieters.  (Id. ¶ 27).  Of the short-term studies that have been conducted, the impact of following the Diet has varied.  For approximately 30% of individuals studied, "bad" cholesterol (LDL) levels increased

---

[2]     The Court notes that it has had success with its own, much simpler diet, which can be described in four words: "Run more, eat less."

after following the Diet.  (Id. ¶ 28).  Dr. Atkins acknowledged
that risk factors for heart disease can worsen for some
individuals who follow the Diet.  (Id. ¶ 30).  These individuals,
as the Book explains, are "fat-sensitive"; however, "intensive
study of medical reports strongly suggests that fewer than one
person in three falls into this category."  (Id. ¶¶ 30-31
(quoting 1999 Edition at 139 (Compl. Ex. E))).

        The Book recommends that the dieter obtain a complete
lipid profile before the Diet and after following the initial --
or "induction" -- stage of the Diet, during which the dieter
avoids almost all carbohydrates.  1999 Edition at 139 (Compl. Ex.
E).  If the lipid profile worsens after the initial stage, the
dieter should follow a low-fat version of the Diet, but should go
back to the regular Diet if he or she "get[s] hungry or [does
not] feel as well on [the low-fat version]."  Id.  If, however,
the dieter is satisfied with the low-fat version, the dieter is
advised to stay with it and have another lipid profile drawn.
Id.  If the results of that profile show that the dieter is "fat
sensitive," the dieter is advised to stay on the low-fat version
of the Diet.  Id. at 140.

        Originally, Dr. Atkins marketed the Diet through books,
nutritional supplements, herbs, and minerals.  (Compl. ¶ 6).
ANI, a New York corporation, was later established to market the
Diet food products and nutritional supplements.  (Id. ¶ 2; Robert
C. Atkins, M.D., Dr. Atkins' New Diet Revolution 73
(HarperCollins Publishers 2002) (the "2002 Edition")).  ANI and

the Estate conduct an advertising and marketing campaign in all
fifty states -- including Florida -- aimed at promoting the Diet
and the sale of Atkins-related products.  (Compl. ¶¶ 4-5, 7).
The Website is an important part of this campaign.  (Id. ¶ 7).

### 2.  **Heart Disease**

Only a small percentage of the population has a true
genetic disposition toward heart disease.  (Compl. ¶ 16).  Heart
disease is linked to serum cholesterol concentration; the higher
a person's serum cholesterol concentration, the greater the
chance that person will develop heart disease.  (Id. ¶ 18).  The
amount of saturated fat and dietary cholesterol a person consumes
will influence a person's cholesterol level.  (Id. ¶ 19).
Cholesterol is found only in animal food products, including
meat, poultry, fish, cheese, and eggs; it is not found in food
derived from plants.  (Id. ¶ 20).  The National Heart, Lung, and
Blood Institute, a division of the National Institute of Health,
recommends that the average adult consume no more than 300
milligrams of dietary cholesterol per day.  (Id. ¶ 23).

### 3.  **Gorran Goes on the Atkins Diet**

Gorran is a resident of Delray Beach, Florida.  (Id.
¶ 1).  He was 53 years old when this case was filed.  (Id.).
After reading the 1999 Edition, Gorran began the Diet in May
2001.  (Id. ¶ 33).  The 1999 Edition, like the 2002 Edition,
contains a disclaimer on the copyright page, which states that
the advice offered in the Book is not intended to be a substitute

for the advice and counsel of the dieter's personal physician.
(<u>See</u> Wargo Decl. Exs. A & B).

While on the Diet, Gorran consumed approximately $25
worth of food products purchased from ANI, including Advantage
Bars, pancake mix, and pancake syrup.  (<u>Id.</u> ¶¶ 44, 84).  He also
ate large amounts of pastrami and "Atkins friendly" cheesecake.
(<u>Id.</u> ¶ 51).  Prior to starting the Diet, he researched the Diet
and discovered that diets high in saturated fats could
potentially increase one's risk for heart disease.  (<u>Id.</u> ¶ 34).
Nevertheless, he began the Diet, relying on the advice of Dr.
Atkins and the ANI website.  That advice consisted of, <u>inter
alia</u>, the following:

- Of the many misconceptions that surround
the [Diet], perhaps the most widespread is
the assumption that eating foods high in fat
is a health risk.  Not so -- in the absence
of refined carbohydrates.

- It is true that every major health
organization . . . endorses a low-fat diet in
the unquestioned belief that fat causes heart
disease.  But are they right?  A good deal of
compelling evidence points in the opposite
direction.

- There is no scientific evidence showing
that consuming fat, saturated or otherwise,
is bad for you in the context of a
controlled-carbohydrate lifestyle.

- Rather than creating high cholesterol
levels, eating saturated fat actually reduces
those levels.

- You will lower your high-risk LDL
cholesterol and total triglycerides far more
effectively -- and far more quickly -- if you
control your carbohydrate consumption in

> general and avoid refined carbs in particular
> than if you avoid animal foods that contain
> cholesterol.

(Id. ¶ 34).

In November 2000, before starting the Diet, Gorran's cholesterol level was 146 mg/dl, his HDL -- or "good" -- cholesterol was 53 mg/dl, his LDL -- or "bad" cholesterol -- was 85 mg/dl, and his triglycerides were 42 mg/dl.  (Id. ¶ 36).[3]  In December 2000, a computed tomography ("CT") scan of his heart revealed that Gorran had zero calcified plaque surrounding his heart, leading to a diagnosis of "very low [coronary vascular disease] risk."  (Id. ¶ 37).

On June 26, 2001, after following the Diet for two months, Gorran's cholesterol was 230 mg/dl, his good cholesterol was 65 mg/dl, his bad cholesterol was 154 mg/dl, and his triglycerides were 56 mg/dl.  (Id. ¶ 39).  At 230 mg/dl, his total cholesterol was well into the "danger range."  (Id.).  Despite the rise in his cholesterol levels, Gorran relied on the advice in the Book and on the Website that rising cholesterol levels were not a reason to discontinue the Diet.  (See id. ¶ 40).

In October 2003, Gorran experienced severe chest pain while on vacation in New York City.  (Id. ¶ 45).  Upon returning

---

[3]     The American Heart Association categorizes cholesterol levels as follows: less than 200 mg/dL is "desirable"; 200-239 mg/dL is "borderline high risk"; and 240 mg/dL and over is "high risk."  What Are Healthy Levels of Cholesterol?, http://www. americanheart.org/presenter.jhtml?identifier=183 (last visited Dec. 11, 2006).

to Florida, he continued to experience chest pain when
exercising.  (Id.).  Thereafter, in October 2003, Gorran
scheduled an appointment with a cardiologist, Dr. Bruce R.
Martin, who conducted a series of tests, including blood tests,
an echocardiogram/Doppler study, and a Thallium stress test.
(Id. ¶ 46).  The blood tests showed that Gorran's total
cholesterol was 209 mg/dl, his good cholesterol was 53 mg/dl, his
bad cholesterol was 127 mg/dl, and his triglycerides were 144
mg/dl.  (Id. ¶ 47).  The stress test found "moderate ischemia of
the anterior wall and apex," meaning that there was some blockage
of the blood vessels leading to Gorran's heart.  (Id.).  The
echocardiogram/Doppler study found "mildly abnormal LV [left
ventricle] with mild hypokenesis [abnormally diminished muscular
function or mobility] of the anterior wall and apex."  (Id.
¶ 49).

        Based on these tests, Dr. Martin directed Gorran to
undergo immediate cardiac catherization.  (Id. ¶ 50).  This
diagnostic procedure revealed a 99% narrowing of one of Gorran's
coronary arteries.  (Id.).  As a result, Dr. Richard Kim
performed an angioplasty, or surgical repair of the blood vessel
by inserting a balloon tipped catheter to unclog it.  (Id.).  Dr.
Kim also placed a stent, or small expandable tube, into Gorran's
artery to help it remain open.  (Id.).  Gorran suffered severe
pain and physical and emotional distress as a result of his
cardiac problems and angiogram.  (Id. ¶ 57).

Following the procedure, Dr. Martin advised Gorran to discontinue the Diet.  (Id. ¶ 51).  Dr. Martin further informed Gorran that, had he not sought treatment when he did, he would have been at risk for a heart attack.  (Id. ¶ 52).

In December 2003, after being off the Diet for two months, Gorran had his cholesterol tested again.  (Id. ¶ 53).  His cholesterol levels returned to normal, with his total cholesterol at 146 mg/dl, his good cholesterol at 52 mg/dl, his bad cholesterol at 81 mg/dl, and his triglycerides at 65 mg/dl.  (Id. ¶ 47).

After he stopped following the Diet, Gorran researched the Diet and learned that many respected health professionals have issued warnings about the Diet -- warnings defendants purportedly urged their followers to ignore.  (Id. ¶ 54).  For example, the American Heart Association warns that, because high-protein foods are often high in saturated fat, following a high-protein, low-carbohydrate diet "for a sustained period of time may increase the risk for coronary heart disease, diabetes, stroke and several types of cancer."  (Id. ¶ 55).  Similarly, the American Diabetic Association warns that ketosis -- the process to which Atkins credits the success of the low-carb diet -- "is an abnormal body process that occurs during starvation due to lack of carbohydrates. . . . Potential long-term side effects of ketosis include heart disease, bone loss, and kidney damage."  (Id. ¶ 56).

Gorran maintains that he would not have followed the Diet had defendants not misled him that these warnings were incorrect or false.  (Id. ¶ 54).  Though he has returned to normal health, Gorran is at risk for future surgical procedures should the stent stop functioning.  (Id. ¶ 58).

Gorran does not state whether he lost weight while on the Diet.

## B.   Prior Proceedings

On May 26, 2004, Gorran filed this complaint in the County Court for Palm Beach County, Florida, against defendants, asserting claims for products liability, negligent misrepresentation, and violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").[4]  (Wargo Decl. ¶ 3).  Defendants made four motions to dismiss or for summary judgment, but the Florida court denied them all.  (Id. ¶¶ 4, 5, 7, 8).  On November 22, 2004, after the second of those motions was filed, defendants filed their answer to the complaint.  (Id. ¶ 6).

On July 31, 2005, ANI commenced voluntary bankruptcy proceedings in the United States Bankruptcy Court for the

---

[4]     Gorran is represented by Daniel Kinburn, Esq., associate general counsel for the Physicians Committee for Responsible Medicine ("PCRM"), a non-profit organization comprised of "[d]octors and laypersons working together for compassionate and effective medical practice, research, and health promotion."  http://www.pcrm.org (last visited Dec. 11, 2006).  PCRM's website features a number of articles criticizing the Diet, including articles discussing this case.  PCRM encourages dieters who may have had health problems while on a low-carbohydrate diet to register on a website it maintains, www.AtkinsDietAlert.org.

Southern District of New York.  (<u>Id.</u> ¶¶ 8, 9).  The Florida action was thereby stayed as to ANI pursuant to 11 U.S.C. § 362. (<u>Id.</u> ¶ 9).  On November 1, 2005, defendants removed the action to the Bankruptcy Court for the Southern District of Florida.  (<u>Id.</u> ¶ 10).  The action was then transferred to this Court, by stipulation of the parties, on November 22, 2005.  (<u>Id.</u>).  The stay was lifted on January 10, 2006.  (<u>Id.</u> ¶ 11).

These motions followed.

**<u>DISCUSSION</u>**

Gorran asserts three claims, which I discuss in turn: (a) products liability, (b) negligent misrepresentation, and (c) deceptive conduct in violation of FDUTPA.

**A.   <u>Products Liability</u>**

Gorran brings a products liability claim for personal injury.  Specifically, he alleges that defendants' products -- books, food products, nutritional supplements, minerals, and herbs -- "are defective and unreasonably dangerous, in that the [D]iet and the [D]iet advice put at least a substantial minority of persons purchasing the products and following the [D]iet at increased risk of cardiovascular disease and other illnesses." (Compl. ¶¶ 68, 70).

Florida law adopts the theory of products liability set forth in Section 402A of the Second Restatement of Torts.  <u>See</u> <u>Samuel Friedland Family Enters. v. Amoroso</u>, 630 So. 2d 1067, 1068

- 12 -

(Fla. 1994); <u>West v. Caterpillar Tractor Co.</u>, 336 So. 2d 80, 84

(Fla. 1976) (quoting § 402A).  Under Section 402A,

> [o]ne who sells any product in a defective
> condition unreasonably dangerous to the user
> or consumer . . . is subject to liability for
> physical harm thereby caused to the ultimate
> user or consumer . . . if (a) the seller is
> engaged in the business of selling such a
> product, and (b) it is expected to and does
> reach the user or consumer without
> substantial change in the condition in which
> it is sold.

Restatement (Second) Torts § 402A (1965).  A product is

considered defective if "it 'is, at the time it leaves the

seller's hands, in a condition not contemplated by the ultimate

consumer, but which will be unreasonably dangerous to him.'"

<u>Bruner v. Anheuser-Busch, Inc.</u>, 153 F. Supp. 2d 1358, 1360 (S.D.

Fla. 2001), <u>aff'd</u>, 31 Fed. Appx. 932 (11th Cir. 2002)

(interpreting Florida law and quoting Restatement (Second) of

Torts § 402A, cmt. g).

Defendants argue that Gorran has failed to state a

products liability claim because (1) the food products are not

defective or unreasonably dangerous, and (2) the Book is not a

"product" for purposes of product liability.  I address each

argument in turn.

## 1.   **Food Products**

Section 402A of the Second Restatement of Torts

clarifies that certain "products cannot possibly be made entirely

safe for all consumption, and any food or drug necessarily

involves some risk of harm, if only from over-consumption."

Restatement (Second) of Torts § 402A cmt. i; see also Bruner, 153 F. Supp. 2d at 1360.  Thus, when a food product is sold in a condition anticipated by the consumer, it is not defective or unreasonably dangerous solely because it may negatively impact an individual's health.  Bruner, 153 F. Supp. 2d at 1360-61 (rejecting plaintiff's products liability claim that beer was defective); accord Pelman v. McDonald's Corp., 237 F. Supp. 2d 512, 532 (S.D.N.Y. 2003) ("the Complaint must allege either that the attributes of [the food] products are so extraordinarily unhealthy that they are outside the reasonable contemplation of the consuming public or that the products are so extraordinarily unhealthy as to be dangerous in their intended use.").

Rather, a food product is defective or unreasonably dangerous when it is in a condition not anticipated by the consumer.  See Olliver v. Heavenly Bagels, Inc., 729 N.Y.S.2d 611, 613 (Sup. Ct. 2001) ("Where, as here, a product by its very nature has a dangerous attribute, liability is imposed only when the product has an attribute not reasonably contemplated by the purchaser or is unreasonably dangerous for its intended use."). As comment (i) of the Second Restatement explains, "[g]ood butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous."  Restatement (Second) of Torts § 402A cmt. i.

To the extent Gorran's products liability claim is based on his consumption of food products, it fails.  First, the allegations cannot support a finding that the food products were defective or unreasonably dangerous for purposes of products liability law.  Contrary to Gorran's allegations, a food product is not defective because it increases the risk of heart disease.  See Restatement (Second) Torts § 402A cmt. i.  Moreover, Gorran has not alleged any facts that would lead to the conclusion that the food products sold by defendants were defective as defined by products liability law; there is no allegation that the food products were not in a condition anticipated by the average consumer.  The average consumer surely anticipated that a high-fat, high-protein diet would increase both cholesterol levels and the risk of heart disease.

In analogous cases brought against alcohol manufacturers under Florida law, courts have dismissed products liability claims, relying on comment (g) of the Second Restatement of Torts.  For example, in Victory Over Addiction Int'l, Inc. v. Am. Brands, Inc., the court interpreted comment (g) as implying "that products . . . intended for human consumption are not unreasonably dangerous -- and thus are not defective without warnings -- even though they may, over a period of time, cause harm which results from commonly-appreciated risks associated with those products."  No. 97 Civ. 14489, 1998 U.S. Dist. LEXIS 23542, at **4-5 (S.D. Fla. 1998).

Second, even assuming the food products here could be considered unreasonably dangerous over an extended period of time, Gorran alleges only that he purchased $25 worth of defendants' products.  Gorran's consumption of $25 worth of protein bars, pancake mix, and pancake syrup was not sufficient, as a matter of law, to have caused his arterial blockage.

To the extent plaintiff's products liability claim is based on food products sold by defendants, it fails.

### 2.  **The Book**

Gorran's products liability claim is also deficient to the extent it is based on the Book, for the Book is not a "product."

Products liability law focuses on "the tangible world." Winter v. G.P. Putnam's Sons, 938 F.2d 1033, 1034 (9th Cir. 1991); Restatement (Third) of Torts § 19(a) (1998) (defining product as "tangible personal property distributed commercially for use or consumption").  Thus, a defect in a book's tangible qualities -- the cover, pages, and binding -- could potentially give rise to a products liability action.  See Cardozo v. True, 342 So. 2d 1053, 1056 (Fla. 2d Dist. Ct. App. 1977) (distinguishing between tangible and intangible aspects of a book).  The intangible qualities of a book, however -- the ideas and expressions -- are not products for purposes of products liability law.  Winter, 938 F.2d at 1034; Restatement (Third) of Torts § 19(a) cmt. d (noting that books are "intangible personal property").  Imposing liability for physical injuries caused by

- 16 -

the ideas contained in a book would "inhibit those who wish to share thoughts and theories," for no author would write on a topic that could potentially result in physical injury to the reader.  <u>Winter</u>, 938 F.2d 1033, 1035; <u>see, e.g.</u>, <u>Jones v. J.B. Lippincott Co.</u>, 694 F. Supp. 1216, 1217 (D. Md. 1988) (dismissing products liability action against medical textbook publisher where student suffered injury after taking enema described in textbook, and stating that "[n]o case has extended Section 402A to the dissemination of an idea or knowledge in books") (citing <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323 (1974)); <u>Walter v. Bauer</u>, 439 N.Y.S.2d 821, 822-23 (Sup. Ct. 1981) (holding that publisher of science textbook not strictly liable for injury sustained by student while performing experiment described in textbook).

On facts similar to those here, the court in <u>Smith v. Linn</u>, 563 A.2d 123, 126-27 (Pa. Super. Ct. 1989), <u>aff'd</u>, 587 A.2d 309 (Pa. 1991), held that a diet book is not a product for purposes of products liability.  There, the publisher of a diet book entitled <u>The Last Chance Diet</u> was sued following the death of a woman who suffered cardiac failure allegedly as a result of following the book's liquid protein diet.  The court rejected the plaintiff's argument that the diet book was a defective product within the meaning of § 402A of the Second Restatement of Torts.

Here, too, because the intangible expressions contained in the Book are not products, Gorran's products liability claim, to the extent it is based on the Book, also fails.

**B.**   **Negligent Misrepresentation**

To state a claim for negligent misrepresentation under Florida law, a plaintiff must allege that: (1) the defendant made a misrepresentation of material fact; (2) the defendant was negligent in making the statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) injury resulted to the plaintiff by his justifiable reliance on the misrepresentation.  Romo v. Amedex Ins. Co., 930 So. 2d 643, 653 (Fla. 3d Dist. Ct. App. 2006).

Gorran alleges that defendants misrepresented the risks of the Diet, defendants were negligent in minimizing the risks of the Diet, defendants intended to induce him to rely on the purported misrepresentations, and his reliance on these statements resulted in his need for heart surgery.  Thus, Gorran has alleged the four elements of misrepresentation.  Defendants nevertheless argue that Gorran has failed to state a claim, arguing that (1) he has not alleged that defendants owed him a duty of care, and (2) the purported misrepresentations are protected speech under the First Amendment.  I discuss each argument in turn.

**1.**   **Duty of Care**

Defendants argue that Gorran has failed to allege that they owed him a duty of care.  Gorran responds that the majority of Florida courts do not require a plaintiff to allege a duty of care to state a claim for negligent misrepresentation.

- 18 -

Gorran's argument fails.  The Florida Supreme Court has
clarified that "ordinary rules of negligence apply" to claims of
negligent misrepresentation.  <u>Gilchrist Timber Co. v. ITT
Rayonier, Inc.</u>, 696 So. 2d 334, 337 (Fla. 1997) (holding that
cause of action for negligent misrepresentation exists under
Florida law and comparative negligence rules apply).  Thus, a
plaintiff must allege that defendant owed him a duty to state a
claim for negligent representation, <u>ZP No. 54 Ltd. P'ship v. Fid.
Deposit Co. of Maryland</u>, 917 So. 2d 368, 374 (Fla. 5th Dist. Ct.
App. 2005), for "there is no reason to differentiate negligent
misrepresentations from any other forms of negligence."
<u>Gilchrist Timber</u>, 696 So. 2d at 338; <u>see also</u> <u>Mosby v. Harrell</u>,
909 So. 2d 323, 327 (Fla. 1st Dist. Ct. App. 2005) ("To state a
claim for negligence under Florida law, a plaintiff must allege a
duty of care owed by the defendant to the plaintiff. . . .").

Plaintiff points to several Florida cases that do not
explicitly require plaintiff to allege a duty of care.  <u>See</u> <u>Romo</u>,
930 So. 2d at 653; <u>Baggett v. Electricians Local 915 Credit
Union</u>, 620 So. 2d 784, 786 (Fla. 2d Dist. Ct. App. 1993);
<u>Wallerstein v. Hosp. Corp. of America</u>, 573 So. 2d 9, 10 (Fla. 4th
Dist. Ct. App. 1991).  These cases are inapposite.  In each, the
duty of care was apparent on its face.

In this case, plaintiff has not alleged that defendants
owed him a duty of care.  Hence, he fails to state a claim for
negligent misrepresentation.  Moreover, even if plaintiff had

properly alleged that defendants owed him a duty of care, as
discussed below, the claim fails for other reasons as well.

### 2.   The First Amendment

Negligent misrepresentation claims and other actions
based on a defendant's allegedly false speech must be reconciled
with the First Amendment, for "[c]onstitutional protection does
not turn upon 'the truth . . . of the ideas and beliefs which are
offered.'"  Oxycal Labs., Inc. v. Jeffers, 909 F. Supp. 719, 724
(S.D. Cal. 1995) (quoting New York Times Co. v. Sullivan, 376
U.S. 254, 271-72 (1964)).  "The First Amendment protects public
debate on matters of public discourse, including scientific
matters."  McMillan v. Togus Reg'l Office, Dep't of Veteran
Affairs, 294 F. Supp. 2d 305, 316 (E.D.N.Y. 2003), aff'd, 120
Fed. Appx. 849 (2d Cir. 2005).  Courts cannot inquire into the
validity of scientific works, for "[a]ny unnecessary intervention
by the courts in the complex debate and interplay among the
scientists that comprises modern science can only distort and
confuse."  Id. at 317.

"[T]he level of First Amendment protection afforded a
party 'depends on whether the activity sought to be regulated
constitutes commercial or noncommercial speech.'"  World
Wrestling Fed'n Entm't, Inc. v. Bozell, 142 F. Supp. 2d 514, 524
(S.D.N.Y. 2001) (quoting Bolger v. Youngs Drug Prods., Corp., 463
U.S. 60, 65 (1983)).  Commercial speech is afforded a lesser
degree of protection than other constitutionally safeguarded
forms of expression, such as political speech.  World Wrestling,

142 F. Supp. 2d at 524 (citing Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758 n.5 (1985)). Commercial speech that is false or misleading is afforded no First Amendment protection at all. Goldberg v. Cablevision Sys. Corp., 261 F.3d 318, 327 (2d Cir. 2001) (citing Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York, 447 U.S. 557, 566 (1980); Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771-73 (1976)).

Commercial speech has been defined as that which "does no more than propose a commercial transaction." World Wrestling, 142 F. Supp. 2d at 525 (quoting New York State Ass'n of Realtors, Inc. v. Shaffer, 27 F.3d 834, 840 (2d Cir. 1994)). In determining whether speech is commercial, the Court considers three factors: (1) whether the communication is an advertisement, (2) whether the communication refers to a specific product or service, and (3) whether the speaker has an economic motivation for the speech. Id. (quoting Procter & Gamble Co. v. Amway Corp., 242 F.3d 539, 552 (5th Cir. 2001)).

Defendants argue that the content in the Book and on the Website is noncommercial speech fully protected under the First Amendment and, thus, cannot form the basis for a claim of negligent misrepresentation. Gorran, on the other hand, contends that the Book and the Website serve as advertisements for defendants' products. I first address the Book and then consider the Website.

###### a.    The Book

I hold that the Book is noncommercial speech entitled to full First Amendment protection, for it does more than merely propose commercial transactions.  The Book is not an advertisement for defendants' products; rather, it is a guide to leading a controlled carbohydrate lifestyle.  The Book discusses, among other things, how the Diet works, why weight loss occurs, general nutritional guidelines, and disease prevention.  Much of this discussion is scientific in nature.  The fact that the Book, within its several hundred pages,[5] contains several references to defendants' products and services does not transform the Book into commercial speech.  Furthermore, any financial gain that accrues to defendants from sales of the Book does not support the conclusion that the Book is commercial speech.  It is well settled that the mere fact that there is an underlying economic motivation in one's activity does not turn that activity into commercial speech.  See Bolger, 463 U.S. at 67 (citations omitted).

The Smith court similarly accorded First Amendment protection to the diet book there, rejecting the plaintiff's argument that no protection should lie for a "false and dangerous diet book" that compromised the life and health of an individual.  563 A.2d at 125.  In that case, as here, the plaintiff could

---

[5]    The hardcover 1999 Edition is 348 pages long, and the paperback 2002 Edition is 540 pages long.  (See Wargo Decl. Exs. A & B).

point to no established exception that deprived the book of First
Amendment protection.

Plaintiff's negligent misrepresentation claim, to the
extent it relies on the Book, is denied.

  **b.**   **The Website**

ANI maintains that the Website content is "purely
opinion" that is protected by the First Amendment and therefore
immune from a negligent representation claim.  (ANI Mem. at 14).
Plaintiff responds that the Website "functions as an electronic
store to promote various [D]iet-related food products" and its
content is, and was in 2001, commercial speech.  (Pl.'s Mem. at
26).

Applying the factors set forth in Procter & Gamble, I
hold that the Website contains both commercial and noncommercial
speech.  Upon navigating to the Website, the user is taken to a
page that prominently displays the ANI "Atkins Advantage" brand
name.  By clicking on "Products" on the main menu bar, the user
has the option to learn about the "superior nutrition and taste"
of the Atkins Advantage product line and compare Atkins Advantage
products to competing brands; by clicking on "Shop," the user can
purchase the products.  These aspects of the Website clearly
propose commercial transactions.  The Website also, however,
contains a wealth of information on how to follow the Diet and
recommendations for optimizing health and nutrition.  (See, e.g.,
Compl. Exs. B, F, J, K).  The main menu bar, in addition to
carrying the "Products" and "Shop" links, allows the user to

- 23 -

navigate to pages entitled "Superior Nutrition," "Atkins Nutritional Approach," "Recipes," and "Learning Center."  These portions of the Website are non-commercial, providing the user with not only information on the Diet, but also general guidance on weight loss and healthy living.

The fact that the Website includes commercial content does not provide grounds for relief.  The basis of plaintiff's claim is that defendants made misrepresentations on the Website that it was safe for dieters to follow the Diet, so long as they restricted their carbohydrate intake.  As the complaint and the exhibits thereto make clear, plaintiff does not premise liability on any commercial transaction proposed on the Website, but, rather, on the Website's general advice pertaining to the Diet.  Because plaintiff's complaints relate solely to the non-commercial aspects of the Website -- speech that is afforded full First Amendment protection -- this claim is dismissed.

## C.   FDUTPA

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade of commerce."  Fla. Stat. § 501.204(1) (2006).  Gorran alleges that defendants have violated FDUTPA by (1) promoting the Diet and products as safe for all customers "when they well knew that, for at least a substantial minority of their customers, the [D]iet and their products carried potential serious risks," (2) failing to give adequate warnings about the adverse health consequences of the

- 24 -

Diet, and (3) claiming that the Diet was "fool-proof" and a guaranteed success "when they well knew that there would be people for whom the [D]iet would not be safe."  (Compl. ¶ 78). In addition to damages in the amount of $40.45 -- the cost of the 1999 and 2002 editions of the Book, plus $25 worth of ANI products -- Gorran seeks an injunction requiring defendants to place warnings on all Atkins-related books, websites, and products.  (Id. ¶¶ 84, 85).  He proposes the following warnings:

> WARNING - LOW-CARBOHYDRATE DIETS MAY BE HAZARDOUS TO YOUR HEALTH - CHECK WITH YOUR PHYSICIAN.
>
> WARNING - LOW CARBOHYDRATE DIETS CAN INCREASE THE LEVEL OF LDL ("BAD") CHOLESTEROL IN YOUR BLOOD.

(Id. ¶ 85).

### 1.   **Applicable Law**

To state a claim under FDUTPA, a plaintiff must allege that the conduct complained of was unfair or deceptive, and must also allege facts sufficient to show that the plaintiff was actually aggrieved by the alleged conduct in the course of trade or commerce.  Florida Office of the Attorney General, Dep't of Legal Affairs v. Tenet Healthcare Corp., 420 F. Supp. 2d 1288, 1309 (S.D. Fla. 2005); Shibata v. Lim, 133 F. Supp. 2d 1311, 1317 (M.D. Fla. 2000).  "In other words, a consumer claim for relief under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."  Rollins, Inc. v. Butland, 932 So. 2d 1172, 1180 (Fla. 2d Dist. Ct. App. 2006).

The statute does not define what actual damages are, but the measure of actual damages has been defined as:

> [T]he difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties. . . . A notable exception to the rule may exist when the product is rendered valueless as a result of the defect -- then the purchase price is the appropriate measure of actual damages.

Id. (citations omitted).  FDUPTA does not apply to a "claim for personal injury or death or a claim for damage to property other than the property that is the subject of the consumer transaction" at issue.  Fla. Stat. § 501.212(3); T.W.M. v. Am. Med. Sys., Inc., 886 F. Supp. 842, 844 (N.D. Fla. 1995).

### 2.  **Application**

As an initial matter, for the reasons set forth above, defendants' conduct was not unfair or deceptive, and defendants' Diet advice and ideas are protected by the First Amendment.

Moreover, Gorran's alleged damages are not recoverable under FDUTPA.  He asserts that the cost of the food products he purchased from ANI and the 1999 and 2002 Editions of the Book are the damages he suffered for which FDUTPA provides relief.  This assertion, however, is belied by the whole of the complaint.  The thrust of Gorran's complaint is that had defendants not misled him into believing that the Diet was safe for everyone, he would never have followed the Diet and would never have suffered cardiac blockage and, consequently, severe pain, and physical and

emotional distress.  (<u>See</u> Compl. ¶¶ 54, 57).  Thus, the true damages that Gorran seeks are for personal injury, but such damages are not recoverable under FDUTPA.

Florida courts have made clear that the only damages compensable under FDUTPA are "economic damages related solely to a product or service purchased in a consumer transaction infected with unfair or deceptive trade practices or acts." <u>Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.</u>, 693 So. 2d 602, 606 (Fla. 2d Dist. Ct. App. 1997); <u>see</u> <u>Montgomery v. New Piper Aircraft, Inc.</u>, 209 F.R.D. 221, 229 (S.D. Fla. 2002) ("Under FDUTPA, recoverable damages are limited to the market value diminution [of the purchased product or service] caused by the deceptive trade practice.").  FDUTPA expressly states that it does not apply to a claim for personal injury.  Fla. Stat. § 501.212(3); <u>see, e.g.</u>, <u>T.W.M.</u>, 886 F. Supp. at 844 (dismissing FDUTPA claim premised on bodily injury and pain and suffering resulting from plaintiff's purchase of defective penile implant).  Gorran has not alleged facts sufficient to show that defendants' alleged unfair or deceptive practices caused a diminution in the value of the products that he purchased.  Accordingly, the FDUTPA claim is dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motions for judgment on the pleadings are granted, and the complaint is dismissed in its entirety, with prejudice and costs but without fees. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

Dated:     New York, New York
           December 11, 2006

                                    DENNY CHIN
                                    United States District Judge